UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,

v.                                          Case No. 02-70925
                                            Honorable Patrick J. Duggan

FORD MOTOR COMPANY,

      Defendant.
_____/

## OPINION AND ORDER

At a session of said Court, held in the U.S.
District Courthouse, Eastern District
of Michigan, on July 21,2006.

PRESENT:    THE HONORABLE PATRICK J. DUGGAN
                       U.S. DISTRICT COURT JUDGE

The United States filed this forfeiture action pursuant to 19 U.S.C. § 1202 and 19 C.F.R. § 10.84(e), seeking $12,374,268 from Ford Motor Company ("Ford").  The Government claims this amount reflects the value of parts Ford imported into the United States from Canada duty-free pursuant to the Automotive Products Trade Act of 1965 ("APTA"), Pub. L. 89-283, Oct. 21, 1965, 79 Stat. 1016.  Presently before the Court is Ford's motion for summary judgment.  The Court held a hearing on Ford's motion on April 27, 2006.

**APTA**

Congress enacted APTA in order to *inter alia* implement the Agreement Concerning Automotive Products Between the Government of the United States and the Government of Canada, signed on January 16, 1965. *See* Automotive Products Trade Act of 1965, Pub. Law 89-283 § 101, 79 Stat. 1016 (1965). The trade agreement between the two countries was enacted to address the significant inefficiency in the automotive industry due to tariffs and other restrictions involving Canadian-United States trade in automotive products. *See* Def.'s Reply Ex. C, President's Message on H.R. 6960 at 14. Pursuant to APTA, goods intended for use as original motor-vehicle equipment ("OEM")– including parts ready for assembly by an original equipment manufacturer such as Ford– can be imported into the United States from Canada duty-free. APTA provides, however, that if a good that entered duty-free under the statute is later diverted to a non-OEM use, the importer must (1) report such diversion to the United States Customs Service ("Customs") and (2) destroy or export the good or pay the duty owed for the good. Pub. L. 89-283 § 404, 79 Stat. 1016, 1023 (1965), codified in 19 U.S.C. § 1202[1]. Pursuant to its authority under APTA, *see id*. § 501, 79 Stat. at 1025, Customs has

---

[1]The section of APTA codified at 19 U.S.C. § 1202 addressing diverted goods is not set forth in the United States Code, but instead is published in The Harmonized Tariff Schedule of the United States ("HTSUS"). *See* 19 U.S.C. § 1202. A current version of HTSUS is maintained and published by the United States International Trade Commission and is available only by purchasing a copy from the Commission. *See id*. The parties graciously have provided the Court with a copy of the relevant HTSUS provision. *See* Def.'s Mot. Ex. 1; Pl.'s Resp. Ex. K.

implemented regulations to enforce the statute. 19 C.F. R. § 10.84.

## Factual Background

Ford has participated in APTA from the program's inception in 1965. In 1992, Ford's Basic Manufacturing Division ("BMD") imported a total of $508,873,472 worth of parts and components under APTA. In its 1992 Diversion Reports to Customs, Ford reported that its BMD had diverted parts valued at $23,027,290; Ford accordingly submitted $622,577 to Customs, representing duties owed for those diversions.

Customs' Detroit Field Office subsequently initiated an audit of Ford to assess whether the company complied with 19 C.F.R. § 10.84 and 19 U.S.C. § 1202 in its 1992 APTA Diversion Reports. *See* Mot. Ex. 6 at 1. The audit, focusing on Ford's BMD, was conducted from December 1993 through July 1996. *See id*. at 1 & 6. The auditors concluded that Ford failed to report "dutiable dispositions"– i.e. diverted goods subject to duty– valued at $18,920,899 and that Ford therefore owed an additional $599,430 in duty for 1992. *See id*. at 26-27. Based on the findings of the audit report, Customs' Detroit Field Office sent a letter to Ford dated November 12, 1996, requesting payment of $599,430. *See* Mot. Ex. 3. In this letter, Customs advises Ford that "[t]he regulations specify that if APTA diverted goods are not destroyed or exported under Customs supervision or the duties paid, the goods, or their value, shall be subject to forfeiture." *See id*.

On December 6, 1996, Ford paid Customs $599,430. In the meantime, Ford filed several protests challenging the auditors' findings that it failed to properly report and pay

duties related to "scrap and export" in its Diversion Reports for 1992 through 1995. *See* Mot. Ex. 4. Specifically as to 1992, Ford contended that $207,626 of the duties it paid on December 6, 1996, were not legally due and payable. *See id.*

On March 11, 1998, Customs issued to Ford a Notice of Penalty or Liquidated Damages Demand for $18,929,899, which Customs claims represents the forfeiture value of the 1992 non-reported dutiable dispositions identified in Custom's audit. *See* Mot. Ex. 7. Customs subsequently suspended the penalty pending the outcome of Ford's previously mentioned protests. On October 6, 1999, the Chief of Customs' Value Branch sent a letter to Customs' Detroit Field Office recommending that the latter grant Ford's protests. *See id.* Ex. 5. Based on this recommendation, the Detroit Field Office sent a letter to Ford on June 22, 2001, re-instituting the penalty process, but reducing the penalty assessed for 1992 to reflect the value of the protested goods for that year. *See id.* Ex. 8. Determining that the protested amount ($207,626) represented 34.6% of the forfeiture value previous sought (i.e. $18,920,899), the Detroit Field Office reduced the penalty by 34.6% to $12,374,268. *See id.*

When Ford subsequently refused to pay the penalty assessed, the Government instituted the pending forfeiture proceedings.

## The Parties' Arguments

Ford contends that it is entitled to summary judgment because it paid the duties owed for the 1992 dutiable dispositions identified in Customs' audit. Ford interprets APTA as only permitting forfeiture if the goods are not exported or destroyed or if duty is

4

not paid in an amount equal to the duty which would have been payable if the goods were not entered duty-free. Relying on two of Customs' prior rulings– *Davidson* HQ 651590 and *General Motors* HQ 608130 (*See* Def.'s Mot. Ex. 11 & 12)– Ford argues that the agency's long-standing view has been that a penalty such as forfeiture is not proper and that no violation of APTA occurs when an importer fails to accurately report dutiable goods but subsequently pays the duty owed on the unreported goods.

Alternatively, Ford argues that Customs failed to provide sufficient notice regarding the methods and technical details of diversion reporting and therefore imposition of a penalty based on Ford's failure to comply with the methods and technical details first identified by Customs in its 1992 audit of Ford would violate the latter's due process rights. Lastly Ford argues that Customs' forfeiture violates the Eighth Amendment's Excessive Penalty Clause.

The Government responds to Ford's motion, noting that Customs assessed a penalty against Ford– not because Ford failed to pay duties owed on all of its diverted goods– but because Ford failed to report all of its diversions in its 1992 Diversion Reports. The Government contends that pursuant to APTA, forfeiture is appropriate if the importer (1) fails to destroy or export the goods or pay the duty owed *or* (2) fails to report diversions to Customs. As there is no dispute that Ford failed to report the diversions identified in Customs' audit in its 1992 Diversion Reports, the Government argues that Ford must forfeit the value of the goods diverted.

As it is this violation that is the basis for the Government's forfeiture action, rather

than the manner in which Ford reported its diversions, the Government contends that Ford's due process rights are not being violated by this forfeiture action. The Government argues that importers clearly are on notice that they must report diversions to Customs pursuant to APTA. Finally, the Government contends that Customs' "penalty" is not a fine subject to the Eighth Amendment's Excessive Fine Clause.

## Standard for Summary Judgment

Summary judgment is appropriate only when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). In this Court's view, there are no genuine issues of material fact in dispute relevant to Ford's liability[2] and a resolution of this case depends solely on statutory and regulatory interpretation. Thus the case is appropriate for resolution by summary judgment.

## Applicable Law and Analysis

As the parties' arguments indicate, disposition of Ford's motion for summary judgment rests on the proper interpretation of APTA. With regard to diverted goods, the Act provides:

> If any Canadian article accorded the status of original motor-
> vehicle equipment is not so used in the manufacture in the
> United States of motor vehicles, such Canadian article or its
> value (to be recovered from the importer or other person who

---

[2]There is a dispute as to whether the value of the goods diverted is equivalent to the amount the Government seeks to forfeit from Ford. Resolution of that dispute, however, is not necessary to decide Ford's motion.

> diverted the article from its intended use as original motor-vehicle equipment) shall be subject to forfeiture, unless at the time of the diversion of the Canadian article the United States Customs Service is notified in writing, and, pursuant to arrangements made with the Service–
>
> (i) the Canadian article is, under customs supervision, destroyed or exported, or
>
> (ii) duty is paid to the United States Government in an amount equal to the duty which would have been payable at the time of entry if the Canadian article had not been entered as original motor-vehicle equipment.

Pub. L. 89-283 § 404, 79 Stat. at 1023, 19 U.S.C. § 1202.  APTA further grants authority to "[t]he head of any agency performing functions authorized by [the] Act" to "prescribe such rules and regulations as may be necessary to perform such functions."  *Id*. § 501, 79 Stat. at 1025.  Pursuant to the Secretary of Treasury's authority under Section 501, which has been delegated to Customs, Customs requires diversion reporting on an annual basis rather than "at the time of the diversion."  Additionally, Customs has prescribed that goods only will be subject to forfeiture "[i]f such article is not destroyed or exported under Customs supervision or the duties paid."  19 C.F.R. § 10.84(e).

In its entirety, Section 10.84 reads:

> If, after a Canadian article has been accorded the status of original motor-vehicle equipment, it is decided to divert the article from its intended use in the manufacture in the United States of motor vehicles, the importer or other person deciding to divert the article from such intended use shall give notice in writing of the decision to the director of the port where entry was made or where the offices of the importer are located and either make arrangements for its destruction or

> exportation under Customs supervision or pay duties in
> accordance with General Note 3(c)(iii)(B)(2) HTSUS.  If such
> article is not destroyed or exported under Customs
> supervision or the duties paid, the article, or its value shall be
> subject to forfeiture.

19 C.F.R. § 10.84(e).  This regulation (which does not appear to provide for forfeiture based only on the importer's failure to notify Customs in writing of a diversion) is consistent with the legislative history of APTA.  For example, the House Ways and Means Committee and the Senate Finance Committee to whom the bill was referred reported that diverted articles "shall be subject to forfeiture unless timely arrangements are made with the U.S. customs service for supervised destruction or exportation of the articles or for the payment of duties which would have been payable at the date of entry if the articles had not been entered as original motor vehicle equipment."  *See* Reply Ex. A (H.R. No. 89-537, at 13 (1965); S. Rep. No. 89-782 at 18, *as reprinted in* 1965 U.S.C.C.A.N. 3670, 3688).

Admittedly the committee reports reflect Congress' intent that the importer bears the burden of informing Customs of its diversion: "The burden of coming forward with payment of appropriate duties upon the change of use is thus placed upon the person responsible for such change."  *Id*.  However, the committee reports further reflect Congress' intent only to punish willful violators who ultimately fail to pay the duty due:

> Taken together, these provisions assure that any importer who
> might try to profit from duty-free entry of a part by
> fraudulently certifying it to be for original equipment and then
> selling it as a replacement part would be subject to
> prosecution under law, and any subsequent diversion without

8

>payment of appropriate duties would render the importer or other person who diverted the article from its intended use liable for the forfeiture of such article or its equivalent value.

*Id*. This is consistent with Congress' purpose in enacting APTA.

Congress enacted APTA in order to aid the automotive industry in the United States and Canada and to facilitate imports from Canada. Congress did not enact the statute to stem the flow of illegal imports of Canadian parts by United States automobile manufacturers; nor was Congress attempting to create more barriers and risks of penalty for the United States auto industry. Yet it is this Court's impression from this case, particularly Customs' report of its audit of Ford, that accurate diversion reporting is a complex task for motor vehicle manufacturers. Once a good is imported duty-free under APTA, detailed records must be maintained to keep track of the disposition of the good. Therefore each division of a large corporation like Ford must be aware of a good's duty-free status and reports its disposition of the good. Any miscalculations along the line can affect an importer's annual diversion calculations. To subject an importer to forfeiture of the goods or their value for miscalculations or other innocent errors was not, in this Court's view, intended by Congress.

Generally courts must not resort to legislative history and other tools of statutory construction when Congress unambiguously expresses its intent in plain and unambiguous terms. *Chevron, U.S.A., Inc. v. Nat'l Res. Defense Council, Inc.*, 467 U.S. 838, 842-43, 104 S. Ct. 2778, 2781 (1984). A court may look beyond the statutory language, however, if it determines that Congress has not directly addressed the precise

9

question at issue. *Id.* at 843, 104 S. Ct. at 2781-82. In this Court's view Congress did not directly address the precise question posed in this case: whether forfeiture is appropriate where (a) the importer submits annual diversion reports to Customs; (b) the importer inaccurately calculates and therefore fails to report some of its dutiable diversions; but (c) the importer pays the duty owed upon discovery of its error. In other words, the plain language of the statute leaves open the question whether Congress intended forfeiture to be an available penalty against an importer that notifies Customs in writing of the importer's diversions but commits errors resulting in the importer not including all of its diversions in its reports, but then pays the duty owed upon discovery of its errors.

  As discussed previously, APTA's legislative history indicates that it was not Congress' intent to require forfeiture where it does not appear that the failure to give the required notification was deliberate and, in fact, the assessed duties were paid. Moreover, it appears that this was Customs' interpretation of the statute as well, for Regulation 10.84(e) clearly does not set forth failure to notify the agency of a diversion as a basis for forfeiture. 19 C.F.R. § 10.84(e). The Supreme Court has "long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer . . ." *Chevron*, 467 U.S. at 844, 104 S. Ct. at 2782.

  In a case addressing the force of a Customs regulation– although different than the regulation now at issue– the Supreme Court noted the ambiguity that may be latent in Customs laws and the importance of Customs regulations. *United States v. Haggar*

10

*Apparel Co.*, 526 U.S. 397, 119 S. Ct. 1392 (1999). The statute and implementing regulation at issue in *Haggar Apparel* provided importing clothing manufacturers a partial exemption from duties otherwise imposed. *Id*. at 385-86, 119 S. Ct. at 1396. Although failing to note any ambiguities in the language of the statute, the Supreme Court indicated that "[a] statute may be ambiguous, for purposes of *Chevron* analysis, without being inartful or deficient." *Id*. at 392, 119 S. Ct. at 1400. The Court explained:

> The present case exemplifies the familiar proposition that Congress need not, and likely cannot, anticipate all circumstances in which a general policy must be given specific effect. Here Congress has authorized the agency to issue rules so that the tariff statutes may be applied to unforeseen situations and changing circumstances in a manner consistent with Congress' general intent.

*Id*. at 392-93, 119 S. Ct. at 1400. The *Hagger Apparel* Court noted that "'[c]onsistent with the *Chevron* methodology, and as has long been the rule in custom cases, customs regulations are sustained if they represent reasonable interpretations of the statute'." *Id*. at 393, 119 S. Ct. at 1400 (quoting P. Reed, The Role of Federal Courts in U.S. Customs & International Trade Law 289 (1997)).

In this Court's view, Customs' Regulation 10.84(e) is a reasonable interpretation of Section 404 of APTA. Not only is it a permissible interpretation of the statute, but it finds clear support in APTA's legislative history and purpose. The Court therefore holds that forfeiture is not available against an importer under the circumstances of this case. But even if forfeiture were appropriate, the Court concludes that awarding the amount

11

sought in this case would violate the Eighth Amendment.[3]

The Eighth Amendment prohibits the Government's imposition of "excessive fines." U.S. CONST. amend. VIII. The Supreme Court has held that the Eighth Amendment's Excessive Fines Clause is not limited to criminal cases and may apply to certain *in rem* civil forfeiture proceedings. *Austin v. United States*, 509 U.S. 602, 607-09, 113 S. Ct. 2801, 2804-05 (1993). As the *Austin* Court explained, it is not whether the proceeding is civil or criminal, but whether the forfeiture constitutes "punishment." *Id*. at 610, 113 S. Ct. at 2806. Recognizing that sanctions often serve more than one purpose, the Court concluded that the Excessive Fines Clause applies if the forfeiture, at least "in part," constitutes punishment. *Id*.

The Supreme Court next considered the Excessive Fines Clause in *United States v. Bajakajian*, 524 U.S. 321, 118 S. Ct. 2028 (1998). That case arose from the defendant's failure to report $357,144 in currency as he was leaving the United States, in violation of federal law which requires individuals leaving the country to report all money in excess of $10,000 in their possession or in their baggage. The defendant subsequently pleaded guilty to failure to report exported currency and the government sought the forfeiture of the $357,144. The Supreme Court held that the forfeiture of the currency constituted

---

[3]The Court is not persuaded by Ford's Due Process argument. Ford argues that certain methods and technical details of diversion reporting adopted by Customs are ambiguous and/or were not conveyed to Ford. Nevertheless, it is not apparent to the Court that Ford's failure to report the dutiable diversions which are the subject of the Government's penalty was due to its failure to comply with those methods or details.

punishment and was excessive.

In reaching this conclusion, the Court noted that the forfeiture statute relied on by the government "directs a court to order forfeiture as an additional sanction when 'imposing sentence on a person convicted of' a willful violation of [31 U.S.C.] 5316's reporting requirement."  524 U.S. at 328, 118 S. Ct. at 2033 (quoting 18 U.S.C. § 982(a)(1)).  Although noting that "[t]raditional *in rem* forfeitures were . . . not considered punishment against the individual for an offense,"[4] the Supreme Court distinguished the case before it because the government had not proceeded against the currency itself, but instead sought and obtained a criminal conviction of the defendant personally.  *Id*. at 331-32, 118 S. Ct. at 2035.  The Court also concluded that the forfeiture served no remedial

---

[4]The Government focuses on this language in the Court's opinion to argue that the present *in rem* proceeding is not subject to the Excessive Fines Clause.  As the *Bajakajian* Court went on to state, however, the fact that proceedings are labeled civil or criminal *in rem* proceedings cannot be relied upon to determine whether the forfeiture is subject to the Eighth Amendment:

> It does not follow, of course, that all modern civil *in rem* forfeitures are nonpunitive and thus beyond the coverage of the Excessive Fines Clause.  Because some recent federal forfeiture laws have blurred the traditional distinction between civil *in rem* and criminal *in personam* forfeiture, we have held that a modern statutory forfeiture is a "fine" for Eighth Amendment purposes if it constitutes punishment even in  part, regardless of whether the proceeding is styled *in rem* or *in personam*.

524 U.S. at 331 n.6, 118 S. Ct. at 2035 n.6 (citing *Austin*, 509 U.S. at 621-22, 113 S. Ct. at 2811-2812).  Thus the Supreme Court has guided courts to focus, not on the label of the proceedings, but on whether the forfeiture is remedial or in part punitive.

purpose. *Id*. at 329, 118 S. Ct. at 2034. To reach this conclusion, the Court rejected the government's argument that the forfeiture was remedial because it "deter[red] illicit movements of cash," reasoning that deterrence traditionally has been viewed as a goal of punishment. *Id*. The Court further reasoned that the forfeiture of the defendant's currency did not serve the remedial purpose of compensating the government for a loss, finding that the government suffered no monetary loss as a result of the defendant's offense– i.e. non-reporting. *Id*. However the Court restated its holding from *Austin* that even if the forfeiture served some remedial purpose, it would be subject to the Excessive Fines Clause if it constitutes punishment even in part. *Id*. at 329 n.4, 118 S. Ct. at 2034 n.4.

    As applied in this case– that is where the importer has paid the duty owed for its diversion– the Court concludes that forfeiture of the value of the property diverted is, at least in part, punitive. Although the government has not pursued criminal charges against Ford, the Court sees no distinction between the forfeiture in *Bajakajian* due to the defendant's failure to report exported currency and the forfeiture sought here due to Ford's failure to report its diversions. As Ford has paid the duty owed for its diversions, the forfeiture will not compensate the Government for any loss in revenue. While some portion of the amount forfeited may compensate the Government for its costs to audit and prosecute Ford, the Government cannot possibly be suggesting that its costs approximate

the more than $12 million sought in this action.[5] Finally, the Supreme Court has stated that a forfeiture that reaches beyond the "instrumentality" of the offense is "*ipso facto* punitive and therefore subject to review under the Excessive Fines Clause." *Bajakajian*, 524 U.S. at 333 n.8, 118 S. Ct. at 2036 n.8. As the Court explained, "the term 'instrumentality' . . . fairly characterizes property that historically was subject to forfeiture because it was the actual means by which an offense was committed." *Id*. (citations omitted) The *Bajakajian* Court noted that the currency sought to be forfeited in the case before it was not an instrumentality but "merely the subject of the crime of failure to report." *Id*. at 334 n.9, 118 S. Ct. at 2036 n.9. Similarly, the diverted goods in this case are not the "instrumentality" of Ford's offense.

Having concluded that forfeiture of the defendant's currency in *Bajakajian* was a fine within the meaning of the Excessive Fines Clause, the Supreme Court announced a test for determining whether a fine is "excessive.": "a punitive forfeiture violates the Excessive Fines Clause if it is grossly disproportional to the gravity of a defendant's offense." *Id*. at 334, 118 S. Ct. at 2036. The Court then concluded that forfeiture of the defendant's entire $357,144 was "grossly disproportional" to the defendant's reporting offense. *Id*. at 337, 118 S. Ct. at 2038. First, the Court noted, the defendant's "crime was solely a reporting offense. It was permissible to transport the currency out of the country

---

[5]As the Supreme Court noted in *Austin*, where the value of the property forfeitable under the statute at issue can vary dramatically, any relationship between the government's actual costs and the amount of the sanction must be coincidental rather than an intended remedial purpose. 509 U.S. at 622 n.14, 113 S. Ct. at 2812 n.14.

so long as he reported it." *Id*. Second, the Court noted that the violation was unrelated to any other illegal activities. *Id*. at 337-38, 118 S. Ct. at 2038. The Court also noted that the harm inflicted was minimal and only affected one party, the government. *Id*. at 339, 118 S. Ct. at 2039.

Applying these considerations to the present case leads this Court to find that forfeiture of the value of the diverted goods is grossly disproportional to Ford's failure to report some of its diversions and therefore violates the Eighth Amendment's Excessive Fines Clause. First, as in *Bajakajian*, Ford's only offense was failing to report certain diversions. Second, Ford's violation was unrelated to any illegal activity. The goods were legally imported duty-free into the United States and were legally diverted from their initially intended OEM-use. Third, Ford annually files diversion reports and appears to do so in good faith and thus does not fall within the category of importers that Congress intended the forfeiture provision to catch. As stated in APTA's legislative history, forfeiture was intended to catch "any importer who might try to profit from duty-free entry of a part by fraudulently certifying it to be for original equipment and then selling it as a replacement part." *See* Def.'s Reply Ex. A (H.R. No. 89-537, at 13 (1965); S. Rep. No. 89-782 at 18, *as reprinted in* 1965 U.S.C.C.A.N. 3670, 3688). Finally, the harm Ford caused by its failure to report certain diversions is nowhere close to the amount sought in this action. Had Ford's reporting errors gone undetected, at most the government would have been deprived the duty that Ford ultimately paid–$391,804. The

16

Government is seeking more than 31 times that amount.[6] Thus even if forfeiture were appropriate, the Court concludes that forfeiture of the entire value of the goods diverted violates the Eighth Amendment's Excessive Fine Clause.

## Conclusion

In summary, the Court holds that forfeiture pursuant to APTA is not available against an importer that has filed diversion reports in good faith and has paid Customs the duty owed for all of its diversions. But even if forfeiture were appropriate, under these circumstances, the Court concludes that forfeiture of the goods diverted or the value of those goods is, at least in part, punitive and therefore subject to the Eighth Amendment's Excessive Fines Clause. The Court also concludes that forfeiture of the entire value of the diverted, but non-reported, goods identified by Customs in its 1992 audit of Ford would be grossly disproportional to the gravity of Ford's defense. As such, it violates the Eighth Amendment.

Accordingly,

**IT IS ORDERED**, that Defendant's motion for summary judgment is **GRANTED**.

                                      s/PATRICK J. DUGGAN
                                      UNITED STATES DISTRICT JUDGE

---

[6]Notably, Customs sent a letter to Ford in September 2001, indicating that it would mitigate the penalty imposed to $391,804, if Ford paid the penalty within fifteen days of the letter. *See* Mot. Ex. 10. Ford, taking the position that forfeiture was inappropriate under the circumstances, refused to pay the mitigated penalty.

Copies to:
Julia C. Pidgeon, Esq.
Thomas W. Cranmer, Esq.
Paulsen K. Vandevert, Esq.
Robert B. Silverman, Esq.